# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1674
_____

Lisa Crain; Cathee Crain; Marillyn Crain Brody; Kristan Snell

*Plaintiffs - Appellees*

v.

Shirley Crain

*Defendant - Appellant*

Ray Fulmer, Executor of the Estate of H.C. Dude Crain, Jr.

*Defendant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith
_____

Submitted: January 12, 2023
Filed: June 23, 2023
_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Years after their father's death, Lisa Crain, Cathee Crain, Marillyn Crain Brody, and Kristan Snell (collectively, Appellees) filed this diversity lawsuit against their stepmother, Shirley Crain, and the executor of their father's estate, Ray Fulmer,

to adjudicate rights to property owned by their father and Shirley. Before the district court,[1] Appellees argued that their father, H.C. "Dude" Crain, Jr. (Dude), breached a property settlement agreement (PSA) that he entered into with their mother, Marillyn Crain (Marillyn), pursuant to Dude and Marillyn's divorce. The PSA— which the Logan County, Arkansas Chancery Court ruled was "contractual and nonmodifiable"—required Dude to maintain a will whereby he would leave "one-half of [his] estate" to Appellees. However, at Dude's death, no such will existed. Instead, Shirley took sole possession of Dude's separate property and retitled all jointly owned assets in her name. After ruling that Dude breached the PSA, the district court imposed a constructive trust over all property Dude owned immediately prior to his death—whether it was owned jointly with Shirley or separately. The district court then used the principles set forth in the Restatement (Third) of Restitution to equitably divide the property, valued at nearly $100 million. Shirley appeals, first arguing that the district court did not have subject matter jurisdiction and that Appellees do not have standing. Alternatively, Shirley argues that, even if this case is properly in federal court, the district court committed numerous substantive errors. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Dude married Marillyn in 1954. Several years later, in 1960, Dude, Marillyn, and Dude's parents founded Crain Sales Company to manufacture foam products. Both Dude and Marillyn played important roles in growing the business. During that time, the couple had four children—Appellees—the only children of the marriage. However, as the business grew, Dude and Marillyn's relationship faltered, and by 1976, the pair had separated.

Years after their separation, in 1984, Dude started dating Shirley. Dude subsequently filed for divorce from Marillyn in the Logan County, Arkansas

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Chancery Court in 1988. By that time, Crain Sales Company, renamed Crain Industries, was a multimillion-dollar operation and had grown to become one of the largest private companies in Arkansas. In 1990, the business was reportedly earning annual revenues of $154 million. As a result, Dude and Marillyn had significant assets to divide in their divorce proceeding. To amicably divide their property, Dude and Marillyn entered into the PSA. Under this agreement, Dude received most of the couple's property. Indeed, Marillyn took no interest in the multimillion-dollar Crain Industries. However, Marillyn and Dude also "agree[d] to maintain in full force and [e]ffect a valid Last Will and Testament whereby each will leave at least one-half of their estate to [Appellees], per stirpes" (the Will Provision). The Arkansas court examined the PSA, declared it "contractual and nonmodifiable," and incorporated it into its final divorce decree. Months after the divorce was finalized, Dude married Shirley, who had one son from a prior relationship.

Throughout their marriage, Dude and Shirley jointly owned real property, bank accounts, and investments. The couple also started and co-owned successful businesses in Northwest Arkansas. Ultimately, the pair amassed significant wealth in Arkansas. However, much of their wealth originated from Dude's sale of Crain Industries for $130 million in 1995. During their marriage, the couple also showered Appellees with gifts and other payments, including 2012 Christmas gifts of $1.6 million each, which were understood as "advances on their inheritance."

Despite the terms of the PSA, Dude did not engage in estate planning until 1993, when he executed a will that left nothing to Appellees and everything to Shirley. Almost twenty years later, Dude engaged an attorney to develop a new estate plan. Under the new, 2012 will, Shirley was to serve as the executor of Dude's estate upon his death, and in that role, was to create two trusts that would hold Dude's separate property: the Bypass Trust and the Marital Deduction Trust. The Bypass Trust was to benefit Appellees and Shirley's son, and would be funded with any assets available to pass through probate, free of estate taxes. The Marital Deduction Trust was to hold the rest of Dude's property, with Shirley serving as sole trustee and sole direct beneficiary. Appellees and Shirley's son were named as

remainder beneficiaries. However, the 2012 will granted Shirley full discretion to pay herself as much of the net income and principal from the Marital Deduction Trust as she desired during her life. Dude executed a codicil shortly after which eliminated per stirpes inheritance, but the rest of the will remained unchanged. Shirley knew about this estate plan because she attended many of the meetings between Dude and his lawyer.

In 2014, Dude suffered a serious head injury in a fall. For the next three years, Shirley took on a much more active role in managing the couple's businesses and investments as Dude was largely incapacitated. Dude passed away in 2017. Neither Shirley nor Appellees opened a probate proceeding at that time. Further, contrary to the instructions in the 2012 will, Shirley did not create either of the trusts she was supposed to. Instead, Shirley took sole possession of Dude's separate property. Jointly owned property passed by operation of Arkansas law to Shirley.

Almost three years later, in March 2020, Appellees filed a petition to open an estate administration in the Circuit Court of Sebastian County, Arkansas. Initially, Shirley represented to Appellees that Dude's 1993 will was the operative will. The Arkansas court subsequently appointed Ray Fulmer as the executor of Dude's estate. Several months later, Shirley proffered Dude's 2012 will as the operative will. The Arkansas court eventually admitted the 2012 will to probate. This probate case remains ongoing.

Days after filing the petition to open an estate administration, Appellees filed this lawsuit against Shirley and Dude's estate in the United States District Court for the Western District of Arkansas. The basis for federal jurisdiction was complete diversity of citizenship; Appellees are citizens of Texas, Dude's estate and Shirley are citizens of Arkansas, and the amount in controversy was well over $75,000. Appellees styled the claim primarily as a breach-of-contract action, alleging that they were third-party beneficiaries of Dude's promise to their mother to leave at least half of his estate to them. As a remedy, Appellees sought specific performance and the imposition of a constructive trust "on no less than one-half (1/2)" of Dude's property

-4-

immediately prior to his death, including jointly owned property that had long since passed to Shirley by operation of Arkansas law.

On cross-motions for summary judgment, the district court ruled that Dude breached the PSA when he failed to leave Appellees at least one-half of his "estate," which the district court interpreted to mean all the property that Dude owned and controlled prior to his death—regardless of whether he owned it jointly or separately. The district court reasoned that specific performance of Dude's contractual promise was the appropriate remedy. However, since "the vast majority of the assets [Dude] enjoyed and controlled during the last two decades of his life were jointly owned with Shirley, either in tenancies by the entirety or in joint tenancies with right of survivorship," the district court struggled with how to give effect to the remedy. Eventually, the district court determined that, to achieve specific performance, it would impose a constructive trust on half of the property Dude owned and controlled up to the moment of his death. The district court then set the matter for trial for the express purpose of identifying and valuing those assets to effectuate its proposed remedy.

Before trial, Shirley filed a "Motion for Clarification or Modification" regarding the district court's summary judgment order in which she argued, among other things, that the district court did not have subject matter jurisdiction to value any assets because of the probate exception to federal jurisdiction. The district court denied this motion in full and ruled that it had jurisdiction under Marshall v. Marshall, 547 U.S. 293 (2006), which reiterated that federal courts have the power "to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims.'" Id. at 310 (citation omitted).

In preparation for trial, the parties "stipulated to the identity and value of nearly all the assets Dude owned and controlled at his death, either individually or jointly with Shirley," and also stipulated to "which of th[o]se assets Shirley still possessed as of the date of trial." The district court then held a three-day bench trial. In a written order following the trial, the district court engaged in the substantial

-5-

undertaking of identifying and valuing all of the assets Dude owned and controlled at his death, categorizing them by separate assets, joint assets, certain gifts, etc. The district court then went on to articulate its equitable determinations and conclusions of law. For assets subject to probate, the court merely "adjudicate[d] the parties' rights in such property and enter[ed] an order declaring such rights," deferring to the state probate court to administer the assets. For the much larger portion of remaining assets, the court exercised its "legal and equitable powers" to determine the parties' rights. The district court awarded Shirley "an equitable right to ownership of 10%" of certain assets, before essentially dividing what remained down the middle referring to § 59 of the Restatement (Third) of Restitution. The district court also refused to credit any gifts made by Dude or Shirley to Appellees—including the 2012 Christmas gifts—reasoning that under 95 Corpus Juris Secundum § 176, a gift is not counted against a contractual obligation unless made by the promisor with reference to the contractual obligation. Ultimately, the district court imposed a constructive trust on nearly $100 million worth of property, much of which Dude and Shirley had owned jointly.

Following the trial, Shirley filed a motion to alter or amend the order and judgment. In this motion, she lodged a two-pronged attack. She first argued that Appellees lacked standing because they could not fairly trace their injury to anything she did or did not do. Next, Shirley argued that the probate and domestic relations exceptions barred jurisdiction. The district court denied this motion. Initially, it determined that Appellees had standing to sue Shirley because she was in wrongful possession of their property and owed them a duty to convey it back to them. Then, the district court reiterated its previous reasoning regarding the probate exception and ruled that the domestic relations exception did not apply since "[t]he case at bar involves a breach of contract claim and has nothing to do with divorce, alimony, child support, or child custody." Shirley also filed a motion for stay pending appeal, which the district court granted to a limited extent. Shirley then requested a stay from this Court, which was denied.

Shirley appeals.  Initially, she argues that the district court did not have subject matter jurisdiction and that Appellees do not have standing.  In the alternative, Shirley argues that, even if this case is properly in federal court, the district court committed numerous substantive errors.  We conclude that the district court had subject matter jurisdiction and Appellees have standing to sue Shirley.  Further, we hold that Dude breached the PSA when he did not leave half of his estate to Appellees and the district court did not abuse its discretion in fashioning equitable relief.  Thus, we affirm.

II.

Crucial to the proper functioning of our federal system is the longstanding maxim that "[f]ederal courts are courts of limited jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  We may only exercise that jurisdiction authorized by the Constitution and by statute.  Id.  But equally as important is the principle that, when jurisdiction lies, federal courts have a "virtually unflagging obligation" to exercise it.  Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  Here, the Appellees properly brought this suit in federal court based on diversity jurisdiction.  Indeed, Appellees are citizens of Texas, Dude's estate and Shirley are citizens of Arkansas, and the amount in controversy is well over $75,000.  See 28 U.S.C. § 1332(a) (diversity jurisdiction requirements).  Nonetheless, Shirley argues that this Court still lacks subject matter jurisdiction based on the probate and domestic relations exceptions.

"Among longstanding limitations on federal jurisdiction otherwise properly exercised are the so-called 'domestic relations' and 'probate' exceptions.  Neither is compelled by the text of the Constitution or federal statute.  Both are judicially created doctrines stemming in large measure from misty understandings of English legal history."  Marshall, 547 U.S. at 299.  Regardless of the origins of the exceptions, the Supreme Court has repeatedly upheld their application, although it has also cautioned that the exceptions are to be interpreted narrowly.  Id.  In this case, which involves the distribution of marital property between a new spouse and

-7-

her deceased husband's estate, as well as the interpretation of an agreement incorporated into a divorce decree, both exceptions are implicated. But we hold that neither applies.

A.

We begin with the probate exception to subject matter jurisdiction. This exception:

> [R]eserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

Id. at 311-12. Federal courts have authority "to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims.'" Id. at 310 (citation omitted). Indeed, as long as they do not interfere with the state probate court's possession of the property, federal courts are empowered to adjudicate the parties' rights in the property and enter an order declaring such rights. Id.

Here, this is exactly what the district court has done. Although there is an open, ongoing probate action in Arkansas state court, the district court has never attempted to interfere with that court's *possession* of any of the property at issue there. Rather, the district court adjudicated the parties' rights to the property and imposed a constructive trust on it. Therefore, we hold that the probate exception to subject matter jurisdiction does not apply.

B.

We now turn to the domestic relations exception. This exception "'divests the federal courts of jurisdiction over any action for which the subject is a divorce, allowance of alimony, or child support,' including 'the distribution of marital property.'" Wallace v. Wallace, 736 F.3d 764, 766 (8th Cir. 2013) (citation omitted). We have had limited occasion to analyze the domestic relations exception, but generally, we apply it only in narrow circumstances. See Lannan v. Maul, 979 F.2d 627, 631 (8th Cir. 1992). For example, in Kahn v. Kahn, 21 F.3d 859 (8th Cir. 1994), we applied the exception to an ex-wife's tort suit against her ex-husband because the conduct underlying the tort claims was the same conduct that the state court had already considered in distributing the couple's marital property pursuant to their divorce. Id. at 861-62; see also Wallace, 736 F.3d at 767 (holding that exception applied to ex-husband's identity-theft tort claims against his ex-wife because state court had already considered the theft in distributing marital property pursuant to the couple's divorce, and therefore, any federal judgment would "modify the state court's marital distribution").

Our sister circuits have applied the exception in actions seeking the distribution of marital property but only when the parties to the action were former spouses. See, e.g., Irish v. Irish, 842 F.3d 736, 741-43 (1st Cir. 2016) (holding that exception applied to ex-wife's claims that ex-husband did not fully disclose his assets or deal in good faith during separation-agreement negotiations because "state courts are experts at dividing marital property" and the ex-wife's suit would require the federal court to re-apportion assets already divided in state court) (emphasis omitted); McLaughlin v. Cotner, 193 F.3d 410, 413 (6th Cir. 1999) (holding that exception applied to ex-wife's breach-of-contract claim against ex-husband because the contract was part of a separation agreement incorporated into a divorce decree). Of course, here, Shirley and Appellees are not former spouses.

Moreover, we did not apply the exception in Lannan v. Maul, which is much more analogous to the factual situation presented here. In Lannan, as part of a

property settlement agreement incorporated into a final divorce decree, an ex-husband promised his ex-wife to maintain a life insurance policy with their daughter named as the beneficiary. 979 F.2d at 628-29. Upon his death, however, the ex-wife discovered that their daughter was not the named beneficiary. Id. at 629. She then filed a claim against the ex-husband's estate on her daughter's behalf, seeking proceeds from a life insurance policy consistent with the property settlement agreement. Id. After the executor of the ex-husband's estate denied her claim, she filed a lawsuit in federal court alleging improper denial. Id. We held that the domestic relations exception did not apply as the issues presented did "not involve a domestic relations dispute between a feuding couple concerning a divorce, alimony, or child custody decree. Rather [they] concern[ed] a third-party beneficiary claim based on contract law." Id. at 631.

Similarly, here, the issues presented do not involve a domestic relations dispute between a feuding couple—both Dude and Marillyn have passed away. Instead, Appellees present a third-party beneficiary claim based in contract law, as in Lannan. Thus, we conclude that the domestic relations exception to subject matter jurisdiction does not apply.

III.

Having established subject matter jurisdiction, we now move to Shirley's claim that the Appellees lack standing because they cannot trace their injury to anything she did or did not do. Article III of the Constitution extends "[t]he judicial Power," only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016). To establish standing Appellees must show that: (1) they have suffered an "injury in fact"; (2) that is "fairly . . . trace[able] to" Shirley's conduct; and (3) which is "likely" to be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (alterations in original) (citations omitted). Since Appellees brought this

suit in federal court, they have the burden of establishing standing. Agred Found. v. U.S. Army Corps of Eng'rs, 3 F.4th 1069, 1073 (8th Cir. 2021).

We are convinced that the Appellees have carried their burden. Shirley does not dispute the Appellees' establishment of the first and third requirements. Indeed, the Appellees have suffered a deprivation of their property rights, and this Court may redress that injury through equitable relief. Rather, Shirley focuses on the second element: traceability. More specifically, she argues that it is Dude who inflicted Appellees' injury when he failed to fulfill his contractual obligations. According to Shirley, then, since Dude caused the Appellees' injury, they do not have standing to sue her instead.

To satisfy the traceability requirement, Appellees' "injury has to be fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (alterations in original). "[T]raceability . . . requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot be overly attenuated." Agred Found., 3 F.4th at 1073 (alterations in original) (citation omitted). Here, although Shirley did not breach the PSA, as she was not a party to it, she holds the property that the Appellees allege rightfully belongs to them under the agreement. Appellees' injury—the deprivation of their property rights—is thus directly traceable to Shirley's continued withholding of the property in violation of her equitable duty to convey it back to them. Because Appellees have suffered an injury in fact which is directly traceable to Shirley's conduct, and this Court may redress that injury by a favorable decision, we are persuaded that threshold standing requirements are satisfied.

IV.

Having overcome the barriers to federal jurisdiction, we now address the merits. Shirley argues that the district court erred in (A) interpreting "estate" in the PSA to mean all the property Dude owned prior to death, (B) imposing a constructive

-11-

trust on the disputed property, and (C) making improper equitable determinations. "Because we are a federal court sitting in diversity, we apply the substantive law of the forum state" in analyzing these claims. Chew v. Am. Greetings Corp., 754 F.3d 632, 635 (8th Cir. 2014). Here, the parties agree that Arkansas law applies. Thus:

> We are bound by decisions of the Arkansas Supreme Court as to the meaning of Arkansas law. When the Arkansas Supreme Court has not addressed an issue, we must predict what rule the court would adopt and may look to the Arkansas Court of Appeals for guidance in this task.

Id. (alterations in original) (citations omitted).

A.

First, we determine the meaning of "estate" in the PSA. Below, the district court decided this legal question on cross motions for summary judgment. Thus, our review is de novo, viewing the facts in the light most favorable to Shirley. See id.

The PSA's Will Provision required Dude to "maintain in full force and [e]ffect a valid Last Will and Testament whereby [he would] leave at least one-half of [his] estate to [Appellees], per stirpes." On the one hand, Shirley argues that the plain meaning of "estate" is "probate estate" since the provision requires the parties to maintain a *will*, which necessarily disposes of property via probate. On the other, Appellees argue that "estate" means all the property that Dude owned and controlled prior to his death. We conclude the latter interpretation is more persuasive.

In Arkansas, "[t]he first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended." Wal-Mart Stores, Inc. v. Coughlin, 255 S.W.3d 424, 429 (Ark. 2007). In effectuating this rule, courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning," as well as "the whole context of the agreement." Id. (citation omitted). "The best construction is that which is

-12-

made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it." Coleman v. Regions Bank, 216 S.W.3d 569, 574 (Ark. 2005).

The term "estate," in and of itself, is ambiguous. See, e.g., Wedin v. Wedin, 944 S.W.2d 847, 849 (Ark. Ct. App. 1997). However, we think that the parties' other uses of "estate" in the agreement as well as the agreement's context gives the word the meaning that Appellees attribute to it. Indeed, following the Will Provision, there is a paragraph stating, "all personal property of every kind and nature now in possession of each party shall, except as provided herein be his or her sole estate, free and clear of all claims or demands of the other." R. Doc. 38-2, at 7. In this paragraph, Dude and Marillyn use "estate" to mean "property" in its broadest sense—not just those properties that they might decide to leave pursuant to a will at death. Of course, we presume consistent usage throughout the agreement.

As to the context, at the time that Dude and Marillyn signed the PSA, Crain Industries—a business they both played major roles in growing—was reporting revenues in the tens of millions of dollars. Just a few years after their divorce, Dude sold Crain Industries and netted approximately $84 million. Despite Marillyn's seeming entitlement to at least a substantial share of this property, she took a comparatively humble sum under the PSA. Indeed, she kept the marital home (subject to its indebtedness), her Mercedes automobile, certain personal properties, bank accounts in her name, a $250,000 payment, and a $1.5 million annuity. Dude kept the remaining, lion's share of the couple's property. Such discrepancies are often explained by one party's lack of representation or sophistication. But here, both parties were represented by counsel. The substantial discrepancy, then, leads us to believe Marillyn chose to forego her share in favor of the couple's children.

Moreover, Shirley's interpretation of "estate" to mean only "probate estate" is not persuasive. If estate had such a meaning, then Dude could easily circumvent the Will Provision. On the policy side, Shirley argues that interpreting "estate" to include all property which Dude owned prior to death effectively precludes the

-13-

couple and those in similar situations from owning property jointly or by the entireties. But the Arkansas Supreme Court has already settled this question as a policy matter. See, e.g., Janes v. Rogers, 271 S.W.2d 930, 933 (Ark. 1954) (concluding that a contract to make a will "is applicable to property held by the spouses in an estate by the entirety, even though it would not pass under the will of either spouse but would devolve on the surviving spouse by operation of law"). Dude was free to do whatever he wanted with half of his property, including owning it jointly with Shirley, but the other half "was subject to and encumbered by the superior contractual rights of [his four] children." Gregory v. Est. of Gregory, 866 S.W.2d 379, 383 (Ark. 1983). To conclude, "estate" means everything Dude owned prior to death—whether he owned it separately or jointly with Shirley—and he therefore breached the PSA when he failed to leave half of this property to Appellees.

B.

Shirley next argues that, even if the district court properly determined that Dude breached the PSA, it erred in imposing a constructive trust because such a remedy is unavailable as a matter of Arkansas law and it is otherwise inappropriate under these circumstances. Appellant Br. 20, 46-47. "We review the district court's equitable remedies for an abuse of discretion," Triple Five of Minn. v. Simon, 404 F.3d 1088, 1095 (8th Cir. 2005), mindful that an error of law is necessarily an abuse of discretion, Menz v. New Holland N. Am., Inc., 440 F.3d 1002, 1005 (8th Cir. 2006) (citation omitted).

Initially, the district court concluded "that specific performance was the appropriate remedy for [Dude's] breach." R. Doc. 203, at 7. However, a difficult issue arose over how to effectuate this remedy since the Appellees did not file this lawsuit until three years after Dude's death. In the intervening period, Shirley sold or exchanged several of the assets, and many were no longer in their original form. The district court determined that the best way to effectuate specific performance of Dude's promise was to impose a constructive trust over all the assets he owned prior

-14-

to death to prevent Shirley's unjust enrichment at Appellees' expense. Based on Arkansas law, we think this resolution was appropriate under these circumstances.

Indeed, the Arkansas Supreme Court has held that specific performance is the proper remedy when a party breaches a contract to make a will and that a beneficiary's right to property under a contract to make a will supersedes the competing right of a joint tenant who acquires that property by operation of law. Janes, 271 S.W.2d at 933-34. Further, the same court has made clear that the imposition of a constructive trust is appropriate "where a person holding title to property is subject to an equitable duty to convey it to another on the ground that [s]he would be unjustly enriched if [s]he were permitted to retain it." Cox v. Miller, 210 S.W.3d 842, 848 (Ark. 2005). Putting these two concepts together, the district court properly reasoned that (1) Appellees' rights in the property that Dude held at the time of his death superseded the rights that Shirley acquired as a joint tenant and (2) without a constructive trust over this property, Shirley would be unjustly enriched by Dude's broken promise to leave half of his estate to Appellees.

Shirley's primary rebuttal is that the Arkansas Supreme Court has yet to unequivocally state that a constructive trust is an available remedy in a breach-of-contract action. She reasons that, since the Arkansas Supreme Court has held that the purpose of a constructive trust is to remedy unjust enrichment, and since "[t]here can be no unjust enrichment in contract cases," Stokes v. Stokes, 491 S.W.3d 113, 121 (Ark. 2016), a constructive trust is unavailable to Appellees as a matter of law. This may be true for a party who can claim the benefit of an express agreement. See Servewell Plumbing, LLC v. Summit Contractors, Inc., 210 S.W.3d 101, 112 (Ark. 2005). But see Carter v. Four Seasons Funding Corp., 97 S.W.3d 387, 402-03 (Ark. 2003) (concluding that "a constructive trust was an appropriate remedy" in case alleging breach of contract, even when defendants contended that this was impermissible because plaintiffs had "an adequate remedy at law, damages"). But Appellees were beneficiaries of an agreement with *Dude*. They had no agreement with *Shirley*, the person in possession of substantially all of Dude's assets when he died. The district court did not encumber these assets with a constructive trust

because Shirley breached the PSA; rather, it did so because Dude breached the agreement and thereby unjustly enriched Shirley at Appellees' expense.

Moreover, the Arkansas Court of Appeals approved of the imposition of a constructive trust in substantially similar circumstances as presented here. In Orsini v. Commercial National Bank, divorcees entered into a property settlement agreement pursuant to which the ex-husband was required to maintain a life insurance policy naming the couple's daughter as the beneficiary. 639 S.W.2d 516, 516 (Ark. Ct. App. 1982). After his death, however, it was discovered that he had breached the contract by naming his new wife as the beneficiary. Id. The Arkansas trial court held that the daughter was a "third-party beneficiary of the property settlement agreement incorporated into her parents' divorce decree" and was therefore entitled to the insurance proceeds. Id. at 517. The Arkansas Court of Appeals upheld the imposition of a constructive trust to prevent the unjust enrichment of the new wife, even absent traditional requirements like fraud or a confidential relationship. Id. at 518.

Likewise, here, the Appellees are the third-party beneficiaries of the PSA incorporated into their parents' divorce decree. Like the father in Orsini, Dude breached his contractual obligation to the Appellees, allowing property which should have gone to them to pass to his new wife, Shirley. And as in Orsini, Shirley will be unjustly enriched absent the imposition of a constructive trust over the property, even if she has not done anything wrong. Cf. id. at 518 ("Innocent parties may frequently be unjustly enriched." (citation omitted)). Thus, since the Arkansas Supreme Court would likely approve of the imposition of a constructive trust under these circumstances, we find no abuse of discretion in the district court's decision to do so.

## C.

Finally, Shirley takes issue with a variety of the district court's equitable determinations. In reviewing a judgment after a bench trial, "[w]e review the district

court's grant of equitable relief for abuse of discretion and its factual findings for clear error." Kuehl v. Sellner, 887 F.3d 845, 852 (8th Cir. 2018). Following the bench trial, the district court shouldered the herculean task of identifying, tracing, and classifying all of Dude's tens of millions of dollars in assets—an undertaking which was particularly difficult given that several years had passed since Dude's death. After evaluating the reams of financial records, testimony, and other record evidence, the district court—in a thorough, 60-page order—undertook substantial factfinding and ultimately divided the property according to equitable principles set forth in the Restatement (Third) of Restitution and Corpus Juris Secundum.

Neither party alleges any error in the district court's decision to apply the Restatement and Corpus Juris Secundum. Thus, we do not evaluate the propriety of this decision, and we take no position on whether such reliance was appropriate under Arkansas law. Instead, Shirley argues that the district court committed a variety of errors in *how* it applied the Restatement and Corpus Juris Secundum.

Under the unique and particular circumstances of this case, a full and fair reading of the district court's thorough and well-reasoned order confirms that it did not abuse its discretion in making its equitable determinations. Even before dividing the property between Shirley and Appellees, the district court awarded Shirley a ten-percent share of the jointly owned property based on her role in growing the couple's wealth. Further, the district court took pains to evaluate each asset individually. For example, the district court did not award Appellees any additional interest in Regional Jet Center (one of Dude's and Shirley's businesses) because they already owned half of it. Certain jointly owned real properties were specifically deemed to be Shirley's alone because of her efforts in building or creating them. Ultimately, the district court undertook a massive, thorough, and reasoned approach to equitably dividing property between Shirley and Appellees. Its extensive order identifying, classifying, painstakingly tracing, and dividing these assets lay bare its dedication to doing justice among the parties in accordance with its wide discretion to fashion equitable relief. Cf. Kuehl, 887 F.3d at 854 (recognizing broad equitable powers of federal courts); see also Russell v. Russell, 430 S.W.3d 15, 20 (Ark. 2013) ("We

-17-

have long recognized that circuit courts, in traditional equity cases, have broad powers to distribute the property in order to achieve an equitable division.").

We recognize that this case is unlike most that federal courts review. But the district court's refusal to apply persuasive authorities in the way Shirley would like them to be read does not establish that the district court abused its discretion in its equitable determinations, and we will not overturn them on this basis.

V.

For the foregoing reasons, we affirm the judgment of the district court.

SHEPHERD, Circuit Judge, concurring.

I write separately to note a lurking abstention issue unaddressed by the parties. Here, the parties have asked the federal courts to address rather complex issues of Arkansas law regarding property rights, the division of marital property, and probate matters. Courts have considered abstaining from exercising their jurisdiction in similar circumstances. See, e.g., Kahn, 21 F.3d at 861 ("[W]hen a cause of action closely relates to but does not precisely fit into the contours of an action for divorce, alimony or child custody, federal courts generally will abstain from exercising jurisdiction."); Deem v. Dimella-Deem, 941 F.3d 618, 625 (2d Cir. 2019) (abstaining when claims were "at least 'on the verge of being matrimonial in nature' and [we]re capable of being fairly resolved in state court"). However, recognizing our "virtually unflagging obligation" to exercise jurisdiction where it lies, Colo. River Water Conservation Dist., 424 U.S. at 817, I concur in the majority's refusal to review this issue sua sponte.

_____